Sheehan & Associates, P.C.
Spencer Sheehan
spencer@spencersheehan.com
(516) 303-0552

United States District Court
Eastern District of New York

1:18-cv-05577-WFK-RER

Dakota Campbell-Clark individually and on
behalf of all others similarly situated

Plaintiff

- against -

First Amended Complaint

Blue Diamond Growers

Defendant

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     Blue Diamond Growers ("defendant") manufactures, distributes, markets, labels and sells "Nut-Thins" crackers under the "Blue Diamond Almonds" brand.

2.     The Products are sold to consumers by third parties from brick-and-mortar stores and available online and sold directly by defendant.

3.     The Products are sold in Original and Artisan varieties in various flavors.

| Original | Artisan |
|---|---|
| Almond Nut Thins | Flax Seed Artisan Nut Thins |
| Hint of Sea Salt Nut Thins | Multiseed Artisan Nut Thins |
| Pecan Nut Thins | Sesame Seed Artisan Nut Thins |
| Smokehouse Nut Thins | Chia Seed Artisan Nut Thins |
| Cheddar Cheese Nut Thins | Asiago Cheese Artisan Nut Thins |
| Country Ranch Nut Thins | |

1

Pepper Jack Nut Thins

Honey Mustard Nut Thins

Honey Cinnamon Nut Thins

4.    The Products' common principal display panel representations include (i), "Almond Nut-Thins," (ii) "Nut & Rice Cracker Snacks," (iii) Blue Diamond Almonds, and (iv) vignettes of almonds.

5.    The Original varieties are identified as Almond Nut-Thins or Pecan Nut-Thins and may be characterized by a flavor (i.e., cheddar cheese).

Almond Nut-Thins                               Pecan Nut-Thins

 

2



6.     The Artisan Nut-Thins incorporate different types of seeds instead of the flavors of the Original Nut Thins.

<u>Chia Seeds</u>                                                    <u>Flax Seeds</u>

  

7.     The Artisan Nut-Thins representations include "Nut-Thins," "Blue Diamond Almonds" and "crafted with Brown Rice, Almonds & Chia (or other) Seeds."

3

8.      The back of the packages (original) states "Almond Nut-Thins," "As The Almond People®, we're pretty partial to almonds in anything, but we think you'll agree these crispy crackers go well with almost anything. Now you can enjoy the delicious taste of Blue Diamond Almond Nut-Thins," "Made with Real Almonds," "Nut-Thins are Guilt-Free Snacking," contains an image of an almond grove and the brand, "Blue Diamond Almonds."



9.      Decades ago, it would have been difficult to imagine a cracker identified in this country as made from anything other than wheat.

10.     "Cracker" is defined as "a dry thin crispy baked bread product that may be leavened

4

or unleavened."[1]

11.    Japanese culture is responsible for the introduction of "Senbei," or rice crackers.

12.    However, the evolution of foods, meshing of cultures and advances in technology have made it such that people can purchase products such as "almond milk" or "vegan butter" – most people understand that the first term modifies the second such that neither contains dairy.

13.    Wheat flour has been the core American ingredient in products identified as crackers since the early 19th century.

14.    Wheat supplies up to 20% of the energy intake of the global population and its annual production of 700 million tons is behind only maize and rice.

15.    At its peak, per-capita consumption of wheat flour reached 146 pounds in the late 1990s and again in 2000.

16.    The wheat flour industry is aware "there's a declining per capita wheat flour consumption" and has sought a "checkoff" program to collect money from commodity producers to promote and market wheat products.[2]

---

[1] Merriam-Webster Online Dictionary, "cracker," https://www.merriam-webster.com/dictionary/cracker.
[2]    Millers, bakers weigh flour checkoff, Matthew Weaver, Capital Press, April 9, 2019, https://www.capitalpress.com/ag_sectors/grains/millers-bakers-weigh-flour-checkoff/article_c1697b04-5ad8-11e9-80e6-27baa6ecadde.html



17.    The decline in wheat and grain consumption is due to (1) its role in a condition called celiac disease, (2) general criticism of its contribution to modern health ailments like obesity, heart disease and digestive issues,[3] and (3) the adoption of dietary regimens which minimize or avoid carbohydrates (i.e., the "Atkins diet").[4]

18.    Celiac disease describes the condition where the small intestine is unable to properly digest gluten, a protein that appears in wheat as well as other grains.

19.    For those with this condition, eating gluten causes difficulty absorbing nutrients, which can lead to everything from anemia to osteoporosis.

---

[3] Andre Mayer, *Why are we waging a war on wheat? Books, blogs and celebrities touting the ills of this ubiquitous grain*, CBC News, Oct 08, 2012, https://www.cbc.ca/news/health/why-are-we-waging-a-war-on-wheat-1.1229404; George Dvorsky, *Why you should probably stop eating wheat*, Gizmodo, December 13, 2012, https://io9.gizmodo.com/why-you-should-probably-stop-eating-wheat-5968164.

[4] Jeff Daniels, Pasta demand wanes as health-conscious consumers see it as carb demon, May 25, 2017, https://www.cnbc.com/2017/05/25/pasta-demand-chills-as-health-conscious-eating-trend-affects-sales-.html (noting a Mintel report finding that global declines in pasta sales can be attributed to avoidance of carbohydrates and more than 1/3 of households having at least one person eating gluten-free); Mark Lang, Gluten-Free Is a Consumer-Driven Trend, New York Times, February 20, 2014, https://www.nytimes.com/roomfordebate/2014/02/20/is-avoiding-gluten-a-risky-fad-or-a-healthy-diet/gluten-free-is-a-consumer-driven-trend ("around the turn of the millennia, consumers switched from low-fat diets to low-carbohydrate diets of various types such as the Dr. Atkins Diet Revolution and the South Beach Diet.").

20.     A 2008 study estimated that in the U.S., 1.76 million people have celiac disease, but an estimated 2.7 million people likely suffer from varying levels of gluten sensitivity or intolerance.[5]

21.     In 2014, as many as 30% of the North American population said that they sometimes avoid wheat and gluten.[6]

22.     Other criticisms of wheat are based on its general properties instead of how it affects individual people.

23.     According to the book, *Wheat Belly* by cardiologist William Davis, wheat has contributed to the obesity epidemic and rise in diabetes, through raising blood sugar.[7]

24.     This is because of its high glycemic index due to the presence of enzymes like amylopectin A, which are more efficiently converted to blood sugar than most other carbohydrates, including table sugar.

25.     Research has corroborated the correlation between grain consumption, diabetes, insulin spikes and sugar conversion.[8]

26.     As a result of the prevalence of gluten-intolerance and wheat's association with negative health outcomes, consumers believe that avoidance of wheat and grains promotes positive health outcomes by consumers.

---

[5] Crimson Hexagon, Gluten-Free: Fad or Fact of Life? Can social media conversations tell us if gluten-free is here to stay? https://www.crimsonhexagon.com/blog/gluten-free-fad-or-fact-of-life/
[6] M.J. Jones et al., "Consumer trends in grain consumption" in Encyclopedia of Food Grains (2016).
[7] Wheat belly: lose the wheat, lose the weight, and find your path back to health. Rodale Books, 2014.
[8] Douglas Yu, Grain-free trend just sprouting in bakery, but may overtake gluten-free, July 25, 2017, BakeryandSnacks, https://www.bakeryandsnacks.com/Article/2017/07/26/Grain-free-trend-just-sprouting-but-may-overtake-gluten-free

27.     Manufacturers and retailers have responded to the growing demand for gluten-free products and "[A]nything that is in the gluten world is being replaced in the gluten-free world— breads, cookies, brownies, rolls."[9]

28.     The possibility to create products from alternative, gluten-free flours – non-grain and non-cereal – is due to "advances in  milling and sifting [of non-traditional commodities], which produce textures similar to wheat flour and much greater consistency than in the past."[10]

29.     In attempting to capture this market, defendant, the largest grower-cooperative of almonds and almond products in the world, has touted their non-grain, non-cereal flour:

> Not only is Blue Diamond Almond Flour naturally gluten-free, it provides nutrients that are often lacking in baked goods, such as calcium, fiber, iron and protein, remarks Jeff Smith, director of marketing. It's perfect for a wide array of applications, including cakes, breads and muffins, as well as cookies, bars and crackers.[11]

30.     The Regional Director for the Almond Board, North America, stated that "almond flour continues to gain traction due to demand for gluten-free products," and "can be a [food] developer's best friend and strongest tool."[12]

31.     Defendant has emphasized the introduction of "new products with almond flour that will be healthier and more nutritious versions of products consumers already love," because "almond flour is low on the glycemic index, is naturally gluten-free and a great food source of antioxidant vitamin E."

---

[9] Liz Parker, Improving the quality and range of gluten-free snacks and baked goods: Gluten-free snacks and baked goods continue to integrate into mainstream eating, Jan. 31, 2018 https://www.snackandbakery.com/articles/91195-improving-the-quality-and-range-of-gluten-free-snacks-and-baked-goods
[10] Donna Berry, Harnessing the power of alternative flour, Food Business News, March 14, 2019, https://www.foodbusinessnews.net/articles/13414-harnessing-the-power-of-alternative-flour.
[11] Liz Parker, Improving the quality and range of gluten-free snacks and baked goods
[12] Romy Schafer Inclusions update Ingredient Technology - Nuts, Fruits and Inclusions, Snack Food & Wholesale Bakery, Feb. 2014

32.     According to defendant, "[T]he versatility of almond flour makes it an ideal ingredient for gluten-free baking and cooking" and "one of the few gluten-free flours that tastes good and does not have a gritty texture."[13]

33.     Consumers and commercial applications are using almond flour across an expanding range of products, from pastries to crackers such as desserts, as well as main meals, where wheat flour would normally be used.[14]

34.     Defendant emphasized that with almond flour, "food manufacturers can easily transition from traditional flour in recipes without compromising taste or texture" and that "almond flour can replace traditional flours in everyday recipes."[15]

35.     Despite defendant's knowledge of and promotion of almond flour (sometimes referred to as almond meal, depending on degree of grinding, among other reasons), almonds are actually not the predominant ingredient in the Products.

36.     According to the ingredient lists, the predominant ingredient across the Products is rice flour in the Original and brown rice flour in the Artisan.

Variety                                                        Ingredient List

---

[13] Blue Diamond Growers, *Baking Up a Storm to Promote Almond Flour*, Almond Facts: News, Views and Industry Insights, May-June 2016, pp.18-20.
[14] FoodIngredientsFirst, KEY INTERVIEW: Recovery in Drought Conditions Sparks Surge in Almond R&D, April 8, 2016, https://www.foodingredientsfirst.com/news/KEY-INTERVIEW-Recovery-in-Drought-Conditions-Sparks-Surge-in-Almond-RD.html
[15] Sheila Wan, *Americas: Almond flour as an alternative to processed flours*, Sept. 12, 2017 (interview with defendant's director of marketing), https://foodnewsinternational.com/2017/09/12/americas-almond-flour-as-an-alternative-to-processed-flours/; Still Interest in Almond Flour, Despite Drought Controversy  May 5, 2015 http://www.nutritionaloutlook.com/food-beverage/still-interest-almond-flour-despite-drought-controversy.

Original Nut-Thins

**INGREDIENTS:** RICE FLOUR, ALMONDS, POTATO STARCH, SALT, EXPELLER PRESSED SAFFLOWER OIL, NATURAL FLAVORS (CONTAINS MILK).

Artisan Nut-Thins

**INGREDIENTS:** BROWN RICE FLOUR, ALMONDS, POTATO STARCH, BROWN RICE, FLAX SEEDS, SEA SALT, SAFFLOWER OIL, NATURAL FLAVORS (CONTAINS MILK).

37.  Based on calculations using the Nutrition Facts and the known nutrient composition of almonds and almond flour obtained from the USDA Food Database, the amount of almond-based components only slightly exceed the potato-based element.

38.  The front of the package is therefore misleading because the reasonable consumer gets the impression

39.  The Products are misleading because despite the labels naming them "Almond Nut-Thins" and more specifically identifying them as "Nut & Rice Cracker Snacks," they are actually rice-flour based crackers, which happen to include equivalent amounts of "almonds" as they do "potatoes."

40.  Plaintiff believed the Almond Products were made with almonds as predominant ingredient in the same way consumers would observe products identified as "wheat crackers" and "rice crackers" and reasonably expect their predominant ingredients to be wheat and rice.

41.  Representing a product in a way that does not accurately identify or describe the basic nature of the food is misleading.

42.  By

10

43.    The representations of the Products as "nut-thins" and "Nut & Rice Cracker Snacks" is misleading, false, deceptive and unfair because it creates an erroneous impression that the more valuable component – nuts, in the form of almond-based ingredients – are present in amounts greater than they actually are.

44.    Naming the Products in this way is misleading because it emphasizes the contribution and amount of almonds relative to the non-almond ingredients – rice and potatoes.

45.    The Products could have been labeled "Rice Crackers with Almonds" or "Almond Flavored Rice Crackers" but defendant chose not to identify the Products in this way, because rice crackers are not a novel or premium product, compared to crackers made from almond ingredients.

46.    The amount of almond ingredients has a material bearing on price and/or consumer acceptance of the Products, and the labeling and/or appearance of the food creates an erroneous impression that almond components are present in an amount greater than is actually the case.

47.    Plaintiff desired to purchase a product that was made primarily of almond ingredients and believed that the predominant ingredients were almonds or derived from almonds.

48.    There are no technical or functional impediments which prevent the inclusion of almond-based ingredients in a larger and predominant amount, relative to the non-almond ingredients.

49.    The Products contain other representations which are misleading and deceptive.

50.    As a result of the false and misleading labeling, defendant sold the Products at a premium price – no less than $2.99 per box (4.25 oz), excluding tax – compared to other similar products represented in a non-misleading way.

Jurisdiction and Venue

11

51.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

52.    Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

53.    This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

54.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

55.    A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

56.    Plaintiff is a citizen of Kings County, New York.

57.    John and Jane Doe plaintiffs are citizens of the other 49 states.

58.    Defendant is a California nonprofit corporation with its principal place of business in Sacramento, California.

59.    During the class period, plaintiff purchased one or more Products for personal consumption with the representations described herein, for no less than the price indicated, *supra*, excluding tax, within this district and/or state.

60.    Plaintiff paid this premium because prior to purchase, plaintiffs saw and relied on the misleading representations.

61.    Plaintiff would consider purchasing the Products again if there were assurances that the Products' representations were no longer misleading.

Class Allegations

12

62. The classes consist of all consumers in the following states: all, New York who purchased any Products subject to the actionable representations during the statutes of limitation.

63. A class action is superior to other methods for fair and efficient adjudication.

64. The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

65. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

66. Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

67. Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

68. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

69. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

70. Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

71. Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>
<u>and Consumer Protection Statutes of Other States and Territories</u>

72. Plaintiff and John and Jane Doe plaintiffs, representing the forty-nine (49) other states where they reside and purchased the Products, incorporate by reference all preceding

paragraphs and assert causes of action under the consumer protection statutes of all fifty (50) states.

a. Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et. seq.*;

b. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et. seq.*;

c. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et. seq.*;

d. California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* and Unfair Competition Law, Cal. Bus. Prof. Code §§ 17200- 17210 *et. seq.*;

e. Colorado Consumer Protection Act, Colo Rev. Stat § 6-1-101, *et. seq.*;

f. Connecticut Unfair Trade Practices Act, Conn. Gen Stat § 42-110a, *et. seq.*;

g. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et. seq.*;

h. District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*;

i. Florida Deceptive and Unfair Trade Practices, Act *Florida Statutes* § 501.201, *et. seq.*;

j. Georgia Fair Business Practices Act, §10-1-390 *et. seq.*;

k. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1, *et. seq.* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statute § 481A-1, *et. seq.*;

l. Idaho Consumer Protection Act, Idaho Code § 48-601, *et. seq.*;

m. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et. seq.*;

n. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et. seq.*;

o. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et. seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et. seq.*;

p. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et. seq.*;

14

q. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et. seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et. seq.*;

r. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen Laws ch. 93A;

s. Michigan Consumer Protection Act, §§ 445.901, *et. seq.*;

t. Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et. seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn Stat. § 325D.43, *et. seq.*;

u. Mississippi Consumer Protection Act, Miss. Code An. §§ 75-24-1, *et. seq.*;

v. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*;

w. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et. seq.*;

x. Nebraska Consumer Protection Act, neb. Rev. Stat. § 59 1601 *et. seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et. seq.*;

y. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et. seq.*;

z. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et. seq.*;

aa. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et. seq.*;

bb. New Mexico Unfair Practices Act, N.M. Sta. Ann. §§ 57 12 1, *et. seq.*;

cc. North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et. seq.*;

dd. Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109;

ee. Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et. seq.*;

ff. Oregon Unfair Trade Practices Act, Ore. Rev. Stat. § 646.608(e) & (g);

gg. Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et. seq.*;

15

hh. South Carolina Unfair Trade Practices Act, S.C. Code Law § 39-5-10, *et. seq.*;

ii. South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et. seq.*;

jj. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*;

kk. Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et. seq.*;

ll. Washington Consumer Fraud Act, Wash. Rev. Code § 19.86/0101, *et. seq.*;

mm. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et. seq.*;

nn. Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et. seq.*

73.   Defendant's representations and omissions are false, unfair, deceptive and misleading and are not unique to the parties and have a broader impact on the public.

74.   Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

75.   Plaintiff desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

76.   The representations and omissions were relied on by plaintiff and class members, who paid more than they would have, causing damages.

<u>Negligent Misrepresentation</u>

77.   Plaintiff incorporates by references all preceding paragraphs.

78.   Defendant misrepresented the quality and nutritional attributes of the Products' composition.

79.   Defendant had a duty to disclose and/or provide non-deceptive labeling of the

16

Products and knew or should have known same were false or misleading.

80.    This duty is based on defendant's position as an entity which has held itself out as having special knowledge in the production, service and/or sale of the product type.

81.    Defendant negligently misrepresented and/or negligently omitted material facts.

82.    Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

83.    Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability</u>

84.    Plaintiff incorporates by references all preceding paragraphs.

85.    Defendant manufactures and sells products which contain almonds.

86.    Defendant warranted that the Products were composed predominantly of almond-based ingredients, when this was not truthful and was misleading.

87.    Plaintiff desired to purchase products which were as described by defendant – predominantly almond-based ingredients.

88.    Defendant had a duty to disclose and/or provide a non-deceptive description of the Products and knew or should have known same were false or misleading.

89.    This duty is based, in part, on defendant's position as the largest almond grower cooperative in the world.

90.    The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

91.    The Products were not merchantable in their final sale form.

17

92.    Plaintiff and class members relied on defendant's claims, paying more than they would have.

Fraud

93.    Plaintiff incorporates by references all preceding paragraphs.

94.    Defendant's purpose was to mislead consumers who seek common foods (i.e., crackers) composed of non-common (i.e., almonds) ingredients.

95.    Defendant's intent was to secure economic advantage in the marketplace against competitors.

96.    Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

Unjust Enrichment

97.    Plaintiff incorporates by references all preceding paragraphs.

98.    Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE,** plaintiff prays for judgment:

1.   Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;

2.   Entering preliminary and permanent injunctive relief by directing defendant to correct such practices to comply with the law;

18

3.  Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law, GBL and other statutory claims;

4.  Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

5.  Such other and further relief as the Court deems just and proper.

Dated:   April 12, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan

Spencer Sheehan (SS-8533)
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com
Joshua Levin-Epstein

19

1:18-cv-05577-WFK-RER
United States District Court
Eastern District of New York

Dakota Campbell-Clark individually and on behalf of all others similarly situated

Plaintiff

- against -

Blue Diamond Growers

Defendant

# First Amended Complaint

Sheehan & Associates, P.C.
505 Northern Blvd., #311
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  April 12, 2019

/s/ Spencer Sheehan
Spencer Sheehan